827 So.2d 828 (2002)
A.L.
v.
S.J. and D.T.
2000982.
Court of Civil Appeals of Alabama.
February 15, 2002.
*829 Melody K. Pate, Albertville, for appellant.
James R. Berry, Albertville, for appellee S.J.
Robert Charles Gish, Jr., Albertville, for appellee D.T.
THOMPSON, Judge.
On September 12, 2000, the trial court entered a judgment in which it established S.J.'s paternity of N.R.J. (hereinafter "the child"). In that judgment, the trial court also awarded joint legal custody of the child to S.J. ("the father") and A.L. ("the mother"), awarded the mother primary physical custody, and ordered the father to pay child support; that judgment incorporated an agreement of the parties.
On September 21, 2000, the father moved to modify the September 12, 2000, *830 judgment to award him primary physical custody of the child. The father also sought an award of temporary custody of the child pending the hearing on his motion to modify custody.
On October 12, 2000, the trial court entered a pendente lite order that incorporated an agreement reached by the parties. That order provided that the mother and the father would share joint legal custody of the child, but awarded primary physical custody of the child to D.T., the child's paternal grandmother. The mother and the father were awarded visitation rights
On April 2, 2001, the trial court conducted an ore tenus hearing (hereinafter "the first hearing") on the father's petition to modify custody. On April 4, 2001, the trial court entered a "dispositional order" in which it awarded primary physical custody of the child to the mother and awarded the father visitation rights. In a June 7, 2001, order, the trial court stated that it had not intended the April 4, 2001, order to constitute a final custody judgment. The father filed a "postjudgment" motion to alter, amend, or vacate the "judgment,"[1] and the paternal grandmother moved to intervene. The trial court granted the paternal grandmother's motion to intervene, and it scheduled a second hearing.
On May 29, 2001, the trial court conducted a second ore tenus hearing (hereinafter "the second hearing"). On June 7, 2001, the trial court entered a judgment in which it awarded the mother and the father joint legal custody of the child, but awarded primary physical custody of the child to the paternal grandmother. The mother filed a postjudgment motion; the trial court denied that motion. Only the mother appealed.
At the time of the child's birth, the mother was 18 years old and the father was 20 years old. The child was 13 months old at the time of the second hearing.
The record indicates that the mother lived with her parents (hereinafter "the maternal grandparents") after the child was born and that she and the maternal grandparents had a tumultuous relationship. At some point shortly after the child's birth, the mother and the maternal grandparents had a fight that resulted in the mother and the child's moving, for a period, into the paternal grandmother's home.
Within three weeks of the September 12, 2000, judgment that established the father's paternity and awarded custody of the child to the mother, the father petitioned for a modification of custody. In his petition for a modification, the father alleged that the mother was living with friends or relatives, that she often left the child in the care the child's grandparents, and that the mother was unemployed and did not contribute to the child's support. The trial court appointed Susan Beck and Peggy Shell as court-appointed juvenile advocates (hereinafter collectively referred to as "the CAJAs"). One week after it appointed the CAJAs, the trial court entered its October 12, 2000, order awarding pendente lite custody of the child to the paternal grandmother. At the time the pendente lite custody order was entered, the CAJAs had recommended that physical custody of the child be awarded to the paternal grandmother.
After the trial court's October 12, 2000, order, the mother found a job through a *831 temporary-employment service, and she obtained her own two-bedroom apartment. The mother was laid off from her employment shortly after the first hearing; she testified that after she was laid off, she worked for her stepfather's business while looking for another job. The mother had obtained another job by the time of the second hearing. The CAJAs testified that the mother had established a nursery for the child in the apartment, and that upon their unannounced visits, the mother's apartment had been neat and clean.
At the first hearing, the mother testified that, before she became pregnant, she had "experimented" with drinking and using marijuana. The mother testified that she no longer drinks and that she does not use illegal drugs. The mother testified that she planned to attend her first parenting class on the night after the first hearing. The mother testified that she had been attempting to enroll in the parenting classes for almost one year, but that there had been "confusion" about those classes. The record does not indicate the nature of that "confusion." However, the CAJAs testified that the mother had attempted to enroll in parenting classes since the summer of 2000.
The mother testified that she believed she should be awarded custody of the child because she loved the child and could meet his needs, and that she had become more responsible and independent and could, therefore, provide a proper home for the child.
At the first hearing, the CAJAs testified that they believed that custody of the child should be returned to the mother. The CAJAs testified that the mother had become more mature and that she had made progress toward becoming independent and being better able to take care of her child. The CAJAs explained that they had initially recommended that the paternal grandmother receive pendente lite custody of the child because after their appointment to this case they had had little time to conduct their initial investigation of the mother. Susan Beck testified that the CJAs understood that their initial custody recommendation was one for a temporary custody arrangement and that that recommendation was not intended to be a recommendation for permanent custody. Beck testified that the CAJAs' previous concerns about the mother had been "eased" by the mother's cooperation with them and by the efforts she had made to create an independent life in order to be able to take care of the child.
At the first hearing, the paternal grandmother testified that she had taken care of the child for much of his life. The paternal grandmother has a four-bedroom home, and she does not work. She testified that she wanted to maintain custody of the child and that her goal was to make a slow, gradual transfer of custody of the child to the father.
The father serves in the United States military and is stationed at an Army base in Kentucky. He lives in military barracks. The father testified that since December 2000, he has been working to obtain a transfer to a military base in Alabama. The father did not know if or when such a transfer might occur. The father testified that if he were awarded custody of the child, he could obtain "emergency housing," and that he had friends who could care for the child when his military duties made him unavailable. The father testified, however, that he would prefer to leave the child with the paternal grandmother if he were awarded custody and to then effectuate a slow, gradual change of custody from the paternal grandmother.
Much of the testimony at both hearings focused on the mother's relationship or *832 interaction with D.W., a boy the mother had dated. D.W. testified at the second hearing; he was 17 years old at the time of that hearing. D.W. admitted that he had used illegal drugs and had consumed alcohol in the past; he also acknowledged that he had overdosed on drugs in October 2000. D.W. testified that he had sought substance-abuse treatment, and that, at the time of the second hearing, he had not used drugs for over one year. The record contains no evidence disputing D.W.'s contention that he had not used drugs or alcohol for a year.
The record indicates that the mother dated D.W. until approximately December 2000. At the first hearing, the mother testified that she had broken off her relationship with D.W. on the recommendation of the CAJAs and because the trial court had ordered that the child not be allowed to be in D.W.'s presence. In its April 4, 2001, order, the trial court had conditioned the award of temporary custody to the mother on her avoiding contact with D.W.
At the second hearing, the paternal grandmother presented evidence indicating that D.W. had been in the mother's apartment several times since the first hearing, and that the mother had contacted D.W. by telephone. The mother and D.W. testified that they were not involved in a romantic relationship. The paternal grandmother testified she had followed D.W. and that he had spent the night at the mother's apartment. The paternal grandmother had also hired a private investigator; that private investigator also indicated that D.W. had stayed overnight in the mother's apartment on an occasion other than the one to which the paternal grandmother testified.
We note that in its June 7, 2001, judgment, the trial court found that the mother had violated its April 4, 2001, custody order requiring her to stay away from D.W. The trial court found the mother to be in contempt and sentenced her to 48 hours in jail, but it suspended that sentence.
Beck testified that the testimony from the second hearing regarding the mother's contact with D.W. caused her to question the mother's maturity. However, she testified that she was not aware that the mother had placed the child in any situation that was harmful or dangerous.
In awarding physical custody of the child to the paternal grandmother in its June 7, 2001, judgment, the trial court found that the best interests of the child would be served by an award of custody to the paternal grandmother. It also found that the benefit of awarding custody to the paternal grandmother "greatly outweigh[ed] the detrimental effect of uprooting the child." Thus, the trial court applied the McLendon standard in reaching its custody determination, and found that the paternal grandmother had met the burden of proof imposed by that standard. See Ex parte McLendon, 455 So.2d 863 (Ala.1984) (a party seeking a custody modification must prove 1) that a material change in circumstances has occurred since the last custody judgment, 2) that the custody change would serve the child's best interests, and 3) that the benefits of the change outweighed the inherently disruptive effect of uprooting the child).
On appeal, the mother argues that the trial court erred in transferring custody from her to the paternal grandmother because, she argues, the trial court applied an incorrect standard of review. Initially, we note that the ore tenus rule applies only to questions of fact, and where the trial court resolves a factual issue in a custody action, its determination on that issue is afforded a presumption of correctness on appeal. Reuter v. Neese, 586 So.2d 232 (Ala.Civ.App.1991). However, *833 when this court is called on to resolve an issue of law, such as the application of the correct standard of review, we review the trial court's judgment de novo, without affording it any presumption of correctness. Ex parte Perkins, 646 So.2d 46 (Ala.1994).
We also note that in this case the paternal grandmother sought to intervene only in the custody dispute between the mother and the father; she did not file any pleading seeking custody of the child. However, where an issue not pleaded by a party is tried before the trial court without an objection by another party, that issue is deemed to have been tried by the implied consent of the parties. Rule 15(b), Ala. R. Civ. P.; Hosea O. Weaver & Sons, Inc. v. Towner, 663 So.2d 892 (Ala.1995). At the second hearing, the paternal grandmother was represented by counsel, and, through her testimony, she sought custody of the child. Neither the father nor the mother objected to the paternal grandmother's presentation of evidence in support of her request for custody. Therefore, we conclude that the paternal grandmother's request for custody of the child was an issue tried by the implied consent of the parties pursuant to Rule 15(b), Ala. R. Civ. P.
The parties dispute whether this action is a dependency action governed by § 12-15-1 et seq., Ala.Code 1975. It is necessary to resolve this issue to determine the applicable standard of review in this matter. In his petition to modify custody, the father did not allege that the child was dependent. However, during the first hearing, the trial court repeatedly referred to that proceeding as a "dispositional" hearing. See § 12-15-71, Ala.Code 1975. The trial court's April 4, 2001, order purported to be a "dispositional order." To enter a dispositional order under the dependency statute, the court was required to first make a finding that the child was dependent. § 12-15-71(a), Ala. Code 1975. At no point during the time this action was pending did the trial court enter an order finding the child to be dependent pursuant to § 12-15-1(10), Ala. Code 1975. Further, at the conclusion of the second hearing, the child's guardian ad litem asked the court to clarify whether that proceeding was an action under the dependency statute. The trial court responded by saying, "I looked back through the file. There is nothing that does indicate that this is a dependency case."
In its June 7, 2001, judgment, the trial court did not make a finding that the child was dependent, and the language of that judgment indicates that the trial court determined that this action was not governed by § 12-15-1 et seq., Ala.Code 1975. After carefully reviewing the evidence in the record on appeal, we agree with the trial court that this case is a custody dispute and that it did not fall within the scope of the dependency statute. See S.T.S. v. C.T., 746 So.2d 1017, 1020 (Ala.Civ.App. 1999) (holding that under the facts of that case, the action primarily involved a custody dispute and, therefore, that the trial court erred in determining the case by applying the dependency statute).
The mother correctly contends that because this action was not a dependency action, in order to award custody of the child to the paternal grandmother, a nonparent, the trial court was required to apply the standard set forth in Ex parte Terry, 494 So.2d 628 (Ala.1986). In Ex parte Terry, our supreme court held that in a custody dispute between a parent and a nonparent, a trial court may not award custody to a nonparent absent a finding, supported by clear and convincing evidence, that the parent is unfit; the exceptions to the rule that a parent has a prima facie right to custody of his or her child arise when a prior custody judgment *834 transfers custody from the parent or where the parent voluntarily forfeits custody of the child. We note that our supreme court had also held that a parent has a prima facie right to custody of his or her child, i.e., the parental presumption, in earlier cases, including Ex parte McLendon, supra. The parental presumption set forth in Ex parte Terry and Ex parte McLendon is not affected by the fact that the parents were not married at the time of the child's birth. Ex parte D.J., 645 So.2d 303, 306 (Ala.1994).
In this case, none of the parties to this action alleged that the mother was unfit, and the trial court did not make a finding that she was unfit. The evidence in the record on appeal indicates that the mother has, on occasion, exhibited poor judgment. However, the evidence in the record on appeal falls short of establishing, by clear and convincing evidence, that the mother was an "`unfit or improper person to be entrusted with the care and upbringing of the child.'" Ex parte Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983) (emphasis omitted)).
The paternal grandmother and the father maintained at trial, and continue to argue in their briefs submitted to this court, that the parental presumption set forth in Ex parte Terry and Ex parte McLendon does not inure in favor of the mother. In support of that argument, they allege that a prior custody order had removed custody of the child from the mother. They also assert that the mother voluntarily relinquished or forfeited custody of the child to the paternal grandmother. Where custody has been removed from a parent by a previous court order, or where a parent has voluntarily forfeited or relinquished custody of a child to the other parent or to a third party, that parent, in order to regain custody, must meet the heavy burden of proof of the McLendon standard. See Ex parte McLendon, supra. See also Ex parte R.C.L., 627 So.2d 920 (Ala.1993); Fricks v. Wood, 807 So.2d 561 (Ala.Civ.App.2001); E.M.C. v. K.C.Y., 735 So.2d 1225 (Ala.Civ.App.1999). The father and the paternal grandmother argue that in order to regain custody of the child, in accordance with McLendon, the mother was required to demonstrate that there existed a material change in circumstances so that the proposed custody change would materially promote the child's best interests, and that the benefits of the custody change would outweigh the inherently disruptive effect of the change on the child. See Ex parte McLendon, supra.
In its October 12, 2001, order, the trial court awarded custody of the child to the paternal grandmother pending the final hearing on the father's motion to modify custody. The paternal grandmother and the father maintain that the October 12, 2001, order was a temporary order that constituted a prior custody judgment that removed custody from the mother. They cite In re F.W., 681 So.2d 208 (Ala.Civ. App.1996), and C.G. v. C.G., 594 So.2d 147 (Ala.Civ.App.1991), in support of their argument that that order was a temporary custody order that would operate to defeat the parental presumption in favor of the mother.
In C.G. v. C.G., supra, the child's aunt moved the trial court for an award of temporary custody of the child; the trial court granted that motion. The child's mother moved to modify that custody award, and the trial court denied the mother's motion. This court acknowledged that a prior order or judgment, even a temporary one, that removed custody from a parent would defeat the parental presumption. The court stated that "[t]emporary custody awards, as opposed to pendente *835 lite awards, are generally intended to last until the court is petitioned by one of the parties to modify the [judgment] and constitute final orders from which an appeal may lie to this court." C.G. v. C.G., 594 So.2d at 149. In that case, however, this court reversed the trial court's judgment after finding that the mother had not had notice of the hearing on the aunt's motion for temporary custody, and holding, therefore, that the burden "remained with the aunt" to establish the mother's unfitness. C.G. v. C.G., 594 So.2d at 149 (citing Webb v. Webb, 508 So.2d 281 (Ala.Civ.App.1987)).
In In re F.W., supra, the mother petitioned the court to transfer custody of her children to the children's paternal aunt; the mother cited her inability to properly care for the children as the basis for her petition. The trial court adopted an agreement of the parties and awarded custody of the children to the aunt and her husband. The mother later filed a "motion for a reconsideration" that the trial court treated as a petition to modify the award of custody to the aunt. In that case, the trial court found the children to be dependent, and this court affirmed that finding. The trial court denied the mother's petition to modify custody, and this court affirmed. In so holding, this court noted that the parental presumption set forth in Ex parte Terry, supra, does not apply where the parent voluntarily forfeits custody or where a prior custody judgment "even temporarily" transfers custody to a third person. In re F.W., 681 So.2d at 211. In that case, the award of custody to the aunt was not a pendente lite custody award; the mother had petitioned the court to modify a previous custody order.
In Sims v. Sims, 515 So.2d 1 (Ala.Civ. App.1987), the father petitioned to modify custody of the parties' child. The trial court awarded the father pendente lite custody. The trial court later awarded custody of the child to the father, after determining that the mother had failed to meet the McLendon standard. In its opinion in that appeal, this court discussed the differences between an award of temporary custody and a pendente lite award:
"[T]emporary custody awards are generally intended to last until one of the parties petitions the court to modify the [order or judgment] granting temporary custody. Pendente lite orders, on the other hand, are generally entered only during the pendency of the litigation, and are usually replaced by a final order or [judgment] which is entered at the end of the litigation. Therefore, a pendente lite order, whether entered ex parte or after notice and hearing, clearly envisions a temporary disposition of custody pending a later final determination of the custody dispute. A second distinction that can be drawn between temporary custody awards and pendente lite awards lies in the manner by which the two orders may be reviewed....
"A third reason that pendente lite orders are distinguishable from temporary orders is that a trial court's judgment in a final [order or judgment] following a pendente lite order must be determined on the basis of evidence submitted to the court in support of the final [order or judgment]. It cannot be based on evidence of changed circumstances submitted in a hearing to modify a temporary [order or judgment]. Thus, the burden of proof in final [orders or judgments] following pendente lite orders is different from the burden of proof required to modify a previous temporary [order or judgment]."
Sims v. Sims, 515 So.2d at 2-3 (citations omitted). This court concluded "as a matter of law that pendente lite orders, unlike other temporary orders or [judgments], do not activate the McLendon rule." Sims v. *836 Sims, 515 So.2d at 3. This court reversed the trial court's judgment, holding that the father, rather than the mother, had the burden of meeting the McLendon standard. Id.
In Creel v. Creel, 582 So.2d 1153 (Ala. Civ.App.1991), the trial court entered a pendente lite custody order awarding custody of the parties' children to the father until the mother could obtain adequate treatment for a drug dependency. When the mother presented evidence indicating that she no longer used the drugs for which she had sought treatment, the trial court awarded her custody of the children. The father appealed, arguing that because he had been awarded temporary custody of the children, the trial court had erred in not requiring the mother to meet the McLendon standard in order to regain custody. This court affirmed the trial court's judgment, noting the distinction between a pendente lite order awarding custody and a temporary award of custody, and concluding that, as a matter of law, the order awarding custody to the father had been a pendente lite order and that that order did not constitute a custody award that would negate the requirement that the father meet the McLendon standard in his petition to modify custody. Creel v. Creel, 582 So.2d at 1154 (citing Sims v. Sims, supra). See also Grant v. Grant, 820 So.2d 824 (Ala.Civ.App.2001) (rejecting the father's argument that an award of pendente lite custody to him, together with the passage of time, shifted to the mother the burden of meeting the McLendon standard).
Our supreme court has also made a distinction between orders awarding temporary custody and pendente lite custody orders in applying the presumption in favor of a parent. In Ex parte R.C.L., supra, that court held that the parental presumption is not defeated by pendente lite orders, as it is by temporary custody orders. In that case, the court concluded that because the custody order at issue directed further home studies and reserved the trial court's determination of the issue of permanent custody, the custody order was a pendente lite order that was "effective only during the pendency of the litigation." Ex parte R.C.L., 627 So.2d at 922. Therefore, the supreme court held, the custody order was a pendente lite order to which the McLendon rule did not apply. Id.
The clear language of the trial court's October 12, 2000, order provides that that order was based on a "pendente lite agreement" of the parties. A pendente lite order does not constitute a prior award of custody that would alter the applicable burden of proof with regard to the custody dispute. See Ex parte R.C.L., supra; Creel v. Creel, supra; Sims v. Sims, supra. The cases relied upon by the paternal grandmother and the father are distinguishable because they each involve an award of temporary custody rather than a pendente lite custody order such as the trial court's October 12, 2001, order. See In re F.W., supra; C.G. v. C.G., supra.
The paternal grandmother and the father also contend that in entering into the agreement upon which the trial court based its October 2, 2001, pendente lite custody order, the mother voluntarily relinquished or forfeited custody of the child to the paternal grandmother. We find the reasoning behind the distinction between a temporary custody order and a pendente lite custody order also to be applicable to the determination whether a parent has voluntarily relinquished or forfeited custody. It would be illogical to conclude that although a pendente lite order did not defeat the parental presumption set forth in Ex parte Terry, supra, and Ex parte McLendon, supra, a parent's entering into *837 a pendente lite agreement upon which the trial court bases its pendente lite order would defeat that parental presumption. We also conclude that such a holding might discourage parents from entering into temporary or pendente lite custody arrangements that would tend to serve a child's best interests.
In D.P.M. v. D.B., 669 So.2d 191 (Ala. Civ.App.1995), the mother asked her mother, the child's grandmother, to care for the child while the mother was in prison. This court held that an ex parte pendente lite custody award of custody to the child's grandmother did not defeat the mother's prima facie right to custody of her child. However, this court remanded that case for a determination whether the mother had voluntarily relinquished custody of the child. In reaching its holding in that case, this court stated:
"Both `[t]his court and our Supreme Court have encouraged custodial arrangements during necessitous times.' M.D.K. v. V.M., 647 So.2d 764, 765 (Ala. Civ.App.1994). We have recognized that a parent who `enlist[s] the aid of [grandparents] to care for the child during difficult times' should not be deemed to have `voluntarily relinquished' custody, because
"`[t]o allow a grandparent to argue that this set of facts supports a finding that a parent voluntarily relinquished custody of a child would promote family discord and would discourage parents from seeking assistance from grandparents to insure that the children have adequate care.'
"M.D.K. v. V.M., 647 So.2d at 765."
D.P.M. v. D.B., 669 So.2d at 194.
The trial court's October 12, 2000, pendente lite order, had it not been based on an agreement of the parties, would not have worked to defeat the mother's prima facie right to custody of her child.[2] We are unwilling to hold that the mother's agreeing to enter into the pendente lite agreement upon which the trial court based its October 12, 2000, order constituted a voluntary relinquishment or forfeiture of her right to custody of the child.
We conclude that, under the facts of this case, the trial court erred in failing to apply the standard set forth in Ex parte Terry, supra, in determining this custody dispute. As stated previously, in order to transfer custody to a nonparent under the standard set forth in Ex parte Terry, supra, the trial court would have to make a determination that the mother was unfit; such a determination must be supported by clear and convincing evidence. Ex parte Terry, supra. In this case, the father and the paternal grandmother did not allege that the mother was unfit. There is also no prior custody order removing custody from the mother. We also reject the argument that the mother voluntarily relinquished custody of the child. Therefore, we must conclude that the trial court erred in failing to apply Ex parte Terry, supra, and in awarding custody to the paternal grandmother. See Ex parte S.T.S., 806 So.2d 336, 341-42 (Ala.2001). The trial court's judgment is reversed. On remand, the trial court is instructed to enter a *838 judgment awarding custody of the child to the mother.
REVERSED AND REMANDED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result.
NOTES
[1] Postjudgment motions filed pursuant to Rule 59, Ala. R. Civ. P., may only be taken from a final judgment. Malone v. Gainey, 726 So.2d 725, 725, n. 1 (Ala.Civ.App.1999).
[2] We note that under the facts of this case, neither the father nor the mother lost his or her prima facie right to custody of the child as against a nonparent as a result of the pendente lite custody agreement or the October 12, 2001, pendente lite order that adopted that agreement. However, the father did not appeal the trial court's June 7, 2001, judgment awarding of custody of the child to the paternal grandmother, and that judgment is final as to him. Therefore, we discuss the facts of this case with regard to the rights of the mother.